Patricia Ludowese RAY, Respondent,

v.

MILLER MEESTER ADVERTISING,
INC., Appellant,

Robert V. Miller, Defendant.

No. C3–02–1605.

Supreme Court of Minnesota.

July 29, 2004.

Joseph W. Anthony, Mary L. Knoblauch, Mark D. Wisser, Minneapolis, for Appellant.

Susan M. Coler, Teresa K. Patton, Minneapolis, for Respondent.

Robert R. Reinhart, Erik T. Nelson, Minneapolis for amicus Minnesota Employment Law Council.

Leslie L. Lienemann, St. Paul, for amicus National Employment Lawyers Association.

## OPINION

MEYER, Justice.

In this appeal, we are asked to decide whether front pay is subject to multiplication under Minn.Stat. § 363.071, subd. 2 (2002).[1]

Appellant Miller Meester Advertising, Inc. (MMA), a Minnesota-based advertising agency, hired respondent Patricia Ludowese Ray in June of 1996 in the position of Vice President/Group Creative Director. At the time she was hired, Ray had 21

---

1. Section 363.071, subdivision 2, has been renumbered and now may be found at Minn. Stat. § 363A.29, subd. 4 (Supp.2003).

years of experience in the advertising industry. In June 1998, after two years of employment and without a negative performance evaluation, Ray was promoted to the position of Creative Director, the first woman to hold that position. Two months later, Ray was terminated by Robert V. Miller, MMA's owner. She was terminated without warning and with no prior criticism of her job performance. Ray then sued MMA and Miller for unlawful gender discrimination under the Minnesota Human Rights Act (MHRA), Minn.Stat. ch. 363 (2002), and Title VII of the federal Civil Rights Act, 42 U.S.C. § 2000e–5(g) (2004).

Ray's Title VII claim was tried to a jury and the MHRA claim was tried to the court. The presiding judge used the jury in an advisory capacity with regard to claims of discrimination under the MHRA. By special verdict, the jury found that Ray was terminated on the basis of her gender and awarded past wage loss in the amount of $73,866, past compensatory damages in the amount of $95,000, future compensatory damages in the amount of $42,250, and punitive damages in the amount of $500,000.

On June 7, 2001, the district court issued its findings of facts and conclusions of law with respect to the MHRA claims. The court concluded that MMA terminated Ray in violation of the MHRA. The court ordered a total of over $1 million in damages on both the Title VII and MHRA claims. The MHRA damage award included $123,004 for three years of front pay which, under Minn.Stat. § 363.071, subd. 2 (2002), the court doubled to $246,008.

MMA appealed, and among its claims of error it asserted that doubling the front pay award was not permitted under the MHRA.[2] The court of appeals reversed the entire Title VII award due to evidentiary errors. *Ray v. Miller Meester Adver., Inc.,* 664 N.W.2d 355, 372 (Minn.App.2003). The court of appeals also reversed the district court's trebling of emotional distress damages under the MHRA. *Ray,* 664 N.W.2d at 370. The court of appeals found no other errors in the district court's evidentiary rulings or determination of liability and damages under the MHRA. *Ray,* 664 N.W.2d at 372. We granted MMA's petition for review on the issue of whether front pay is subject to multiplication under the MHRA.

■ We begin by briefly examining the nature of front pay. "In employment contracts, the general rule is that '[t]he measure of damages for breach of an employment contract is the compensation which an employee who has been wrongfully discharged would have received had the contract been carried out according to its terms.' " *Feges v. Perkins Rests., Inc.,* 483 N.W.2d 701, 709 (Minn.1992) (quoting *Zeller v. Prior Lake Pub. Sch.,* 259 Minn. 487, 493, 108 N.W.2d 602, 606 (1961)). However, a court may award future damages, or front pay, for lost compensation that occurs after the time of trial. *Id.* at 710. The potentially speculative nature of front pay awards is limited by the plaintiff's duty to mitigate damages, the evidence presented concerning the extent of the potential damages, and the principle that front pay awards are limited to the damages caused by the breach of contract. *Id.*

---

**2.** MMA asserted that the district court abused its discretion by admitting testimony that was either an improper lay opinion, irrelevant, unduly prejudicial, or an improper expert opinion. *Ray v. Miller Meester Adver., Inc.,*

664 N.W.2d 355, 362 (Minn.App.2003). MMA also argued that the admission of inadmissible evidence resulted in prejudicial error in both the Title VII jury trial and in the MHRA bench trial. *Ray,* 664 N.W.2d at 362.

■ Under the MHRA, when a court finds that an employer engaged in an unfair discriminatory practice, the court shall order the employer to pay "compensatory damages in an amount up to three times the actual damages sustained." Minn.Stat. § 363.071, subd. 2 (2000). The question in this case is whether front pay is a component of "actual damages" and, therefore, subject to multiplication under the MHRA. This is an issue of statutory construction that we review de novo. *State v. Wukawitz*, 662 N.W.2d 517, 525 (Minn.2003).

The legislature did not provide a definition of actual damages in the MHRA. However, we have already construed the meaning of this phrase in *Phelps v. Commonwealth Land Title Ins. Co.*, 537 N.W.2d 271, 275 (Minn.1995). In *Phelps* we cited with approval the definition of actual damages found in *Black's Law Dictionary*. *Phelps*, 537 N.W.2d at 275. *Black's Law Dictionary* defines actual damages as "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses.—Also termed *compensatory damages*." *Black's Law Dictionary* 394 (7th ed.1999). We concluded in *Phelps* that "[i]n general, compensatory damages 'consist of both general and special damages. General damages are the natural, necessary and usual result of the wrongful act

or occurrence in question. Special damages are those which are the natural but not the necessary and inevitable result of the wrongful act.' "[3] *Phelps*, 537 N.W.2d at 275 n. 2 (quoting *Black's Law Dictionary* 390 (6th ed.1990)). We further construed the term "actual damages" as having the meaning ascribed by common law.[4] *See id.* at 275.

■ The common law principle that actual or compensatory damages may include future losses is well established in Minnesota. *See, e.g., Pietrzak v. Eggen*, 295 N.W.2d 504, 507–08 (Minn.1980) (holding that the jury should have been instructed on future medical expenses as a component of special damages); *Hake v. Soo Line Ry. Co.*, 258 N.W.2d 576, 582 (Minn.1977) (providing that the jury could consider a special damage award that consisted of future medical expenses and future lost wages). Additionally, a tort victim may recover future damages caused by the tortfeasor even though it may be difficult to determine the exact amount of those damages. *See Pietrzak*, 295 N.W.2d at 507.

■ We conclude that a front pay award is a form of actual damages because it is an award that is the "natural, necessary and usual result" of an employer's

---

**3.** Likewise, the Restatement (Second) of Torts defines compensatory damages as "the damages awarded to a person as compensation, indemnity or restitution for harm sustained by him." *Restatement (Second) of Torts* § 903 (1979). Section 910 of the Restatement further states that the victim of a tort "is entitled to recover damages from the [tortfeasor] for all harm, past, present and *prospective*, legally caused by the tort." (Emphasis added.) The Restatement also notes that both general and special damages are forms of compensatory damages. *Id.* § 904. The Restatement, like *Phelps*, defines general damages as "compensatory damages for a harm so frequently resulting from the tort that is the basis of the action that the existence of the damages is

normally to be anticipated and hence need not be alleged in order to be proved." *Id.* (1). The Restatement defines special damages as "compensatory damages for a harm other than one for which general damages are given." *Id.* (2).

**4.** The dissent asserts that we improperly rely on the Restatement of Torts and prior tort cases to define compensatory damages. To the contrary, we are merely relying on our precedent in *Phelps*, where we looked to the common law definition of compensatory damages as defined by *Black's*. *See Phelps*, 537 N.W.2d at 275.

discriminatory behavior. As we have clearly stated, front pay awards are limited to the damages caused by the employer's breach. *Feges*, 483 N.W.2d at 710. Therefore, front pay awards are subject to multiplication under Minn.Stat. § 363.071, subd. 2, and the district court did not err when it doubled the award.[5]

■ MMA argues that front pay cannot be a component of "actual damages" because the MHRA provides at Minn.Stat. § 363.071, subd. 2:

> In addition to the aforesaid remedies, in a case involving discrimination in
>
> (a) employment, the [court] may order the hiring, reinstatement or upgrading of an aggrieved party, who has suffered discrimination, with or without back pay, * * * or any other relief the [court] deems just and equitable.

MMA reasons that the provision of reinstatement as a remedy for employment discrimination *in addition to* actual damages necessarily means that front pay cannot be awarded as a part of actual damages. We rejected an almost identical argument pertaining to back pay in *Phelps*. In *Phelps*, the employer argued that back pay was not an element of actual damages subject to multiplication under Minn.Stat. § 363.071, subd. 2, because back pay could be awarded attendant to an upgrade in hiring or reinstatement of the party who suffered discrimination. 537 N.W.2d at 277–78. We stated that "[w]e do not believe the statute precludes the inclusion of back pay as an element of damages that is subject to multiplication" because Minn.Stat. § 363.071, subd. 2,

gives a court the discretion to award back pay either as actual damages or as damages "attendant to the hiring, reinstatement or upgrading of an aggrieved party." *Id.* at 278. Similarly, the statute permits a court to award front pay as a component of actual damages and, additionally, gives the court the authority to order reinstatement of the aggrieved party. Front pay is not a substitute for the remedy of reinstatement as MMA contends; instead, it is a distinct measure of damages that may be awarded in combination with reinstatement.

■ MMA also urges this court to adopt the approach federal courts have taken in interpreting front pay awards under Title VII and hold that front pay is a substitute for the equitable remedy of reinstatement and, therefore, does not constitute actual damages subject to multiplication under the MHRA. In construing the MHRA, we have at times "relied on principles developed under Title VII" but we are not bound by interpretations of Title VII. *Turner v. IDS Fin. Servs. Inc.*, 471 N.W.2d 105, 107 (Minn.1991); *see also Carlson v. Indep. Sch. Dist. No. 623*, 392 N.W.2d 216, 220 (Minn.1986).

There are significant differences between the MHRA and Title VII. *Carlson*, 392 N.W.2d at 221. Portions of the MHRA, including the sex discrimination prohibition, appear to be patterned after the Uniform Law Commissioners' Model Anti–Discrimination Act, not Title VII. *Carlson*, 392 N.W.2d at 220; *see also Minn. Mining & Mfg. Co. v. State*, 289 N.W.2d 396, 399 (Minn.1979). Because "[t]he scope of discrimination liability, and

---

**5.** Our precedent and the legislative history of the MHRA do not support the dissent's contention that front pay awards should not be subjected to multiplication because multiplication will overcompensate the victim and "threaten the existence of certain businesses." In *Phelps*, we noted that "the legislature defined compensatory damages to be an amount up to three times the actual damages proven." 537 N.W.2d at 275. Such a multiplier can undoubtedly impact employers. Nonetheless, it is the legislature, not the courts, that should balance the policy considerations raised and inherent in the MHRA.

its consequences, is more onerous under our state laws than under Title VII," we are not bound to follow seemingly analogous federal court decisions. *Carlson,* 392 N.W.2d at 221. For example, we rejected the federal standard for proof in a same-sex harassment claim because "the MHRA is *not similar* to Title VII in its treatment of sexual harassment." *Cummings v. Koehnen,* 568 N.W.2d 418, 422 n.5 (Minn. 1997) (emphasis added).

The question is whether the MHRA is sufficiently *similar* to Title VII in its treatment of damages such that we should adopt Title VII principles with respect to front pay. The remedies provided under Title VII permit a court to "order such affirmative action as may be appropriate, which may include, but is not limited to reinstatement or hiring of employees, with or without back pay * * *, or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g) (2004). Further, a party may recover "compensatory and punitive damages as allowed in subsection (b) of this section, *in addition to* any relief authorized by [42 U.S.C. § 2000e–5(g)]." 42 U.S.C. § 1981a(a) (2004) (emphasis added). The United States Supreme Court has held that front pay is included within equitable remedies and is intended under Title VII as an alternative remedy to reinstatement. *Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 853–54, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001). In contrast, the plain language of the MHRA not only allows a court to multiply a compensatory damage award, it also gives a court the power to "order the hiring, reinstatement or upgrading of an aggrieved party, who has suffered discrimination, with or without back pay * * * or any other relief the [court] deems just and

equitable." Minn.Stat. § 363.071, subd. 2(a). As discussed above, our interpretation of the damages language of the MHRA is based on the common law of damages, and does not characterize its monetary remedies as equitable remedies or substitutes for equitable relief. Because Congress includes an award of back pay within the equitable remedies available under Title VII, we conclude that the scope of damages under the MHRA is not similar to those provided under Title VII and we decline to adopt Title VII damages principles for the MHRA.[6]

Affirmed.

GILBERT, Justice (dissenting).

I respectfully dissent. I disagree with the majority's classification of front pay as a component of "actual damages" that is eligible for multiplication under the Minnesota Human Rights Act. The stacking of the federal and state relief and then multiplication of large portions of the relief, without providing a rationale for that multiplication, plus punitive damages, leads to a result that I do not believe was contemplated by our legislature.

The multiplying provision in the MHRA was created to be a compensatory rather than punitive measure. As we have noted, "although the trebling function in this statute has a deterrent effect, it is primarily a compensatory measure which is made all the more clear by the statute's explicit labeling of the treble damages as 'compensatory.' " *Phelps v. Commonwealth Land Title Ins. Co.,* 537 N.W.2d 271, 277 (Minn. 1995). In evaluating the MHRA, we have previously looked toward *Black's Law Dictionary* to define compensatory damages

**6.** The Eighth Circuit Court of Appeals held that front pay awards are not subject to multiplication under the MHRA. *Mathieu v. Gopher News Co.,* 273 F.3d 769, 781–82 (8th Cir. 2001). We decline to follow the Eighth Circuit's interpretation of Minnesota law because its analysis is almost wholly based on federal case law under Title VII.

as those damages for which a person has "actual losses." *Id.* at 275 (quoting *Black's Law Dictionary* 390 (6th ed.1990)). In the absence of an explicit definition within the statute, compensatory damages should be approached as being "synonymous with actual damages." *Phelps,* 537 N.W.2d at 275.

In an attempt to define "compensatory damages," the majority relies on personal injury tort cases and the Restatement of Torts.[1] Indeed, I find it curious that the majority would do so, being that the present case involves employment discrimination, which is not a tort. We have previously distinguished between tort claims and claims under the MHRA, holding we do not allow "double recovery" for concurrent MHRA claims and tort claims. *See Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 379 (Minn.1990) (holding that a MHRA sexual harassment claim does not address the conduct addressed by the common law tort of battery). In addition, federal and state courts around the country, in various contexts, have repeatedly declined to classify employment discrimination as a tort. *See Boyd v. O'Neill,* 273 F.Supp.2d 92, 97 (D.D.C.2003) (noting that tort claims and employment discrimination claims "seek[ ] to remedy a different wrong. [The federal discrimination statute] exists to redress employment discrimination, while common law tort theories aim to amend personal injuries. It is not 'double recovery' to be compensated twice based on one set of conduct if that conduct resulted in two distinct types of harm."); *Keating v. Gaffney,* 182 F.Supp.2d 278, 291

(E.D.N.Y.2001) ("Employment discrimination is not a tort."); *Jancey v. Sch. Comm. of Everett,* 421 Mass. 482, 658 N.E.2d 162, 173 (1995) ("acts of discrimination—whether intentional or unintentional—do not thereby become torts."); *McMillan v. Mass. Society for Prevention of Cruelty to Animals,* 168 F.R.D. 94, 96–97 (D.Mass. 1995) ("in tort cases for personal injuries or property damage, compensation for future lost wages will be treated conceptually as an already incurred loss of earning capacity; while, in discrimination cases * * * expected future income reductions will be treated conceptually as losses not yet incurred (i.e., "front pay damages")) (quoting *Kuppens v. Davies,* 38 Mass.App.Ct. 498, 649 N.E.2d 164, 165 (Mass.1995)).

If it is not enough that the majority relies on the Restatement of Torts to define terms within a non-tort MHRA question, the majority also misinterprets the Restatement of Torts itself. The majority quotes the Restatement of Torts that defines compensatory damages as damages awarded to a person for harm "sustained." Restatement (Second) of Torts § 903 (1979). It is important to note that the Restatement utilizes the past tense of the word "sustain," and does not provide any sort of prospective or future harm reference (i.e., "will sustain"). Next, the majority cites to Section 910 of the Restatement, which states that a person injured by a tort is entitled to recover "damages * * * for all harm, past, present and prospective, legally caused by the tort." It is not so obvious, however, that Section 910 is directly tied to Section 903 as the majority

<hr/>

1. In a footnote, the majority asserts that it is "merely relying on our precedent in *Phelps,* where we looked to the common law definition of compensatory damages as defined by *Black's.*" Reading through the majority opinion, it is clear that the majority goes much further. As I explain *infra,* not only does the majority ignore relevant portions of the

*Black's Law Dictionary,* but it also heavily relies on tort cases and the Restatement of Torts to define "compensatory damages" and front pay in an employment context. This approach signals a departure from our opinion in *Phelps,* where we did not rely on tort cases to define terms in an employment-related statute.

asserts. Section 910 generally provides for "damages" but does not express the type of damages that should be awarded. In addition, nowhere in the comments to Section 910 does it mention the terms "compensatory damages" or "actual damages." I am sure that the majority recognizes that a variety of types of recoverable "damages" exist in the legal world that would not be classified as "actual damages." Of course, as previously noted and it should be clear, the Restatement of Torts is limited in scope to torts, which does not include employment discrimination.

The majority also cites to several of our past tort-related cases to attempt to link employment "front pay" with future medical "special damages."[2] The majority ties these personal injury cases to the present matter by arguing that the "special damages" we allowed in those cases are the same as "special damages" that we tied to "compensatory damages" in *Phelps*. *Phelps*, 537 N.W.2d at 275. The majority then makes a second step to argue that our definition of future medical expenses as "special damages" in prior tort-related injury cases can be utilized to define "front pay" as an "actual damage" in the current employment discrimination matter. The connection that the majority makes between these medical tort cases and the present case is tenuous at best. Future damages in employment discrimination are calculated in a different manner than future expenses in tort cases. Tort cases offer a different degree of certainty when calculating future damages. *See Pietrzak*,

295 N.W.2d at 508 ("future pain and suffering as well as future diminished earning capacity are so inextricably tied to future surgery.").

Although not cited by the majority, several other relevant authorities are helpful in deciding the "front pay" issue presented in this case. *See Sprint Spectrum LP v. Comm'r of Revenue*, 676 N.W.2d 656, 662 (Minn.2004) (noting that we are reluctant to be restricted by any one source for the definition of certain terms). As the majority recognizes, in *Phelps*, we relied on *Black's Law Dictionary* to define "compensatory damages." *Phelps*, 537 N.W.2d at 275. *Black's Law Dictionary* defines "actual damages" as "[a]n amount awarded to a complainant to compensate for a *proven* injury or loss; damages that repay actual losses.—Also termed *compensatory damages.*" *Black's* 394 (7th ed.1999) (emphasis added). Looking further into *Black's*, which the majority declined to do, separately, and in contrast, *Black's* defines "prospective damages" as "[f]uture damages that, based on the facts pleaded and proved by the plaintiff, can reasonably be expected to occur." *Black's* at 396. Although *Black's* does not explicitly define front pay, it defines a virtually equivalent term "front wages" as "[p]rospective compensation paid to a victim of job discrimination until the denied position becomes available." *Black's* at 1573. After closely approaching the definitions of these terms, it becomes clear that front pay is more closely related to "prospective damages" rather than "compensatory" or "actual damages."

2. For example, in *Pietrzak v. Eggen*, 295 N.W.2d 504, 507 (Minn.1980), we allowed a jury to calculate future damages as "special damages" that were the direct result of a tort-related foot surgery. We stressed that we would allow such a calculation because "future pain and suffering as well as future diminished earning capacity are so inextricably

tied to future surgery and its attendant expenses." *Id.* at 508. Similarly, in *Hake v. Soo Line Ry. Co.*, 258 N.W.2d 576, 583 (Minn. 1977), we allowed a jury to take into consideration future damages as "special damages" in a personal injury case, noting that "damages for personal injury, as in the instant case * * * [are not] fixed."

We have also acknowledged the prospective nature of front pay awards. In *Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d 701, 710 (Minn.1992), we recognized the inherent speculative nature of front pay awards, noting that the "greatest danger of post-trial or front-pay damages in employment cases is their uncertainty." To alleviate the danger of uncertainty, we advised that three steps must be taken to prevent the awards from being "unduly speculative": First, based on the plaintiff's duty to mitigate front pay damages should be limited to "those cases where the plaintiff has been unable to find comparable employment after termination." *Id.* Second, front pay awards must be based on objective evidence regarding "the feasibility of reinstatement, the employee's prospects for future employment, the certainty of what the employee's income would have been absent the breach, and the length of time for which front-pay is sought." *Id.* Third, front pay must be limited to "those losses caused by the breach." *Id.* Front pay is not a preferred remedy, but rather a last resort when all avenues for reinstatement or subsequent employment have been exhausted.

We have not been alone in recognizing the speculative and prospective nature of front pay awards. The Supreme Court has analyzed the role of front pay in compensating victims of employment discrimination under the Civil Rights Act, finding that front pay is not an element of compensatory damages. *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 852, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001). It defined front pay as "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Id.* at 846. In a situation where reinstatement would cause another employee to be displaced, "courts have ordered reinstatement upon the opining of such a position and have ordered front pay to be paid until reinstatement occurs." *Id.* Where reinstatement is not viable because of continuing workplace hostilities or psychological trauma from the discrimination, front pay serves "as a substitute for reinstatement" and not a form of compensatory damages. *Id.*

The Supreme Court's classification of front pay as not being a form of compensatory damages has been utilized towards the MHRA. In a directly analogous case to the present matter, the Eighth Circuit Court of Appeals analyzed the role of front pay in the MHRA, finding that front pay does not constitute compensatory damages under that statute. *Mathieu v. Gopher News Co.*, 273 F.3d 769, 782 (8th Cir.2001). In *Mathieu*, the Eighth Circuit found that front pay is not subject to multiplication under the MHRA. It first noted that "front pay is the alternative to the preferred equitable remedy of reinstatement." *Id.* (citations omitted). Based on this assumption it stated,

> It should be obvious that the multiplier under the Minnesota statutes would not be awarded on top of reinstatement; there is no monetary award to be multiplied when reinstatement is determined proper. This counsels against multiplying its equitable alternative.

> An award of front pay also is inherently speculative in length of time and when considering possible mitigation by reason of other employment. It is based on probabilities rather than actualities. This easily distinguishes it from damages which have been actually incurred. Indeed, the mere fact that a front pay damage award is discretionary makes it distinguishable from the award of back pay, which can be readily determined within a degree of reasonable certainty.

*Id.* Unlike the majority, the Eighth Circuit in *Mathieu* appears to utilize a realistic interpretation of the multiplier provision. Unfortunately, the majority glossed over *Mathieu* in a footnote by quickly distinguishing it as being "almost wholly based on federal case law under Title VII" rather than the Minnesota MHRA. While the majority is correct in asserting differences between the federal Title VII and Minnesota MHRA, these differences should not affect the more general definition of front pay—i.e., as a prospective remedy utilized as an equitable substitution for reinstatement.

With that definition in mind, it seems unreasonable to multiply a front pay award as it would be impossible to multiply a reinstatement order. For example, had the district court determined that reinstatement was proper in Ray's scenario, it would not have been able to "multiply" the reinstatement. She would have simply been able to retain her job. As reinstatement would have been extremely difficult in Ray's scenario, front pay was awarded as an equitable substitution. It seems illogical to subject this remedy to multiplication merely because it happens to be a monetary figure rather than a reinstatement order. As the Eighth Circuit has pointed out, "there is no monetary award to be multiplied when reinstatement is determined proper. This counsels against multiplying its equitable alternative." *Mathieu*, 273 F.3d at 782.

Multiplying an award of front pay would overcompensate a victim by allowing a greater reward than an equitable substitution for reinstatement. In addition, it would create an unwarranted incentive for a victim to not seek reinstatement or subsequent employment, because the victim is being compensated at a greater, multiplied rate than the assessed value of the victim's future work. *See Snow v. Pillsbury*, 650 F.Supp. 299, 300 (D.Minn.1986) (denying nine-year front-pay award on grounds it was too speculative that plaintiff would have voluntarily remained employed in same position until retirement); *Riethmiller v. Blue Cross & Blue Shield of Mich.*, 151 Mich.App. 188, 390 N.W.2d 227, 233 (1986) (noting "[t]he recognition that front pay damages are available creates the possibility of substantial monetary liability for some employers.")[3]

The majority's classification of front pay will contribute to disturbingly large damage awards that could threaten to bankrupt businesses. We have previously noted that the damages provisions of the MHRA are designed to restore a victim of discrimination "as near as possible, to the same position she would have attained had there been no discrimination." *Anderson v. Hunter, Keith, Marshall & Co., Inc.*, 417 N.W.2d 619, 627 (Minn.1988). In the present matter, Ray's base damage claim of $199,332 for lost back and front pay has been expanded by a multiple of five when emotional distress and all the add-ons are taken into consideration. The total award under the dual relief provisions amounted to over $1 million before the court of ap-

---

**3.** While I acknowledge that a district court has wide discretion to decide whether compensatory damages should be multiplied, I find it troubling that little guidance or uniformity exists in the multiplying process. In the present matter, the district court found "that the awards of frontpay and backpay to Ray should be doubled." The district court did not explain why it chose to double the award. For other options, the district court could have declined to multiply the award or triple the award, and it did not explain the reasoning behind the path it took. The process of multiplying an award without any sort of rationale disturbingly leads to a lack of uniformity in judgment awards. The same judgment under an identical set of facts could easily be tripled by one judge, doubled by another judge, and declined to multiply by a third judge.

peals reversed the Title VII portion of the verdict and the district court's doubling of emotional distress damages.[4] After the court of appeals reversed the Title VII portion and emotional distress multiplication of the judgment, the MHRA portion of the judgment amounts to almost $900,000.[5]

In context, when Ray was terminated in August of 1998 she was earning approximately $100,000 per year, plus benefits. At the time of the trial, 2½ years had gone by and she could not find a substantially equivalent job, but to her credit, started her own company and had mitigated her damages in the year 2000 to the extent of $65,000 per year. Even assuming that Ray was forced to take an unjustified and significant pay cut due to appellant's discriminatory practices, the MHRA judgment amounts to almost nine times her prior salary for one year. If Ray continues to earn her reduced income of $65,000 per year, the final judgment equals more than 25 times the difference between her previous salary and her present salary ($35,000 difference).[6]

The economic impact of this judgment on an employer, who at that time of trial had 23 employees and was in the service business, will be devastating. A major multinational company may be able to absorb the economic damages under this system but the very existence of small to medium-sized companies is put at risk by the stacking, duplication, multiplication and combining of all of these remedies arising out of the same wrongful conduct, without any coordination of benefits or remedies, and without any uniform guidance for the multiplication of awards. Allowing multiplication on a purely specula-

tive front pay award, that is meant to be a last-resort equitable substitution for the preferred remedy of reinstatement, will only contribute to these massive judgments that could threaten the existence of certain businesses. I do not believe that this is the result the legislature envisioned when they created the multiplying provision that was not meant to be a punitive measure.

4. Originally, the total judgment entered on July 19, 2002 amounted to $1,082,719.35.

5. In addition, Ray's former employer is required to implement multiple measures in

order to restructure their procedures for handling employees.

6. Out of this final judgment, punitive damages under the MHRA amounted to $6,000.